**Appeal No. 24-1388**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

---

**PATRICIA CONWAY**,

Plaintiff-Appellant,

v.

**MERCY HOSPITAL ST. LOUIS**,

Defendant-Appellee.

---

**Appeal from the United States District Court**
**for the Eastern District of Missouri**
**Case Number 4:22-cv-01113-RLW**

---

# ADDENDUM TO APPELLEE'S BRIEF

---

James M. Paul
OGLETREE, DEAKINS, NASH,
STEWART, AND SMOAK, P.C.
7700 Bonhomme Avenue, Ste. 650
St. Louis, Missouri 63105
314.802.3935 (tel)
314.802.3936 (fax)
james.paul@ogletree.com

Attorneys for Appellee Mercy Hospital St. Louis

TABLE OF CONTENTS

Statutes and Regulations Page No.

86 Fed. Reg. 12842 (March 1, 2023) (amending 41 C.F.R. ........................ 1
pt. 601)

88 Fed. Reg. 61555-01 (November 5, 2021) (amending ............................ 6
42 C.F.R. 416, 418, 441, 460, 482-86, 491, 494)

*Brown v. Mercy Clinic East Communities*, Case No. ............................... 10
18SL-CCC03624 (Circuit Court of St. Louis County,
May 19, 2023)





**Authority:** 33 U.S.C. 941; 29 U.S.C. 653, 655, 657; Secretary of Labor's Order No. 12–71 (36 FR 8754), 8–76 (41 FR 25059), 9–83 (48 FR 35736), 1–90 (55 FR 9033), 6–96 (62 FR 111), 3–2000 (65 FR 50017), 5–2002 (67 FR 65008), 5–2007 (72 FR 31160), 4–2010 (75 FR 55355), 1–2012 (77 FR 3912), or 8–2020 (85 FR 58393), as applicable; and 29 CFR 1911.

Sections 1918.90 and 1918.110 also issued under 5 U.S.C. 553.

Section 1918.100 also issued under 49 U.S.C. 5101 et seq. and 5 U.S.C. 553.

■ 12. Add subpart K to part 1918 to read as follows:

### Subpart K—COVID–19.

Sec.
1918.107–1918.109 [Reserved]
1918.110 COVID–19.
1918.107 through 1918.109 [Reserved]

#### § 1918.110 COVID–19.

The requirements applicable to longshoring work under this section are identical to those set forth at 29 CFR 1910.501.

## PART 1926—SAFETY AND HEALTH REGULATIONS FOR CONSTRUCTION

■ 13. The authority citation for part 1926 is revised to read as follows:

**Authority:** 40 U.S.C. 3704; 29 U.S.C. 653, 655, and 657; and Secretary of Labor's Order No. 12–71 (36 FR 8754), 8–76 (41 FR 25059), 9–83 (48 FR 35736), 1–90 (55 FR 9033), 6–96 (62 FR 111), 3–2000 (65 FR 50017), 5–2002 (67 FR 65008), 5–2007 (72 FR 31159), 4–2010 (75 FR 55355), 1–2012 (77 FR 3912), or 8–2020 (85 FR 58393), as applicable; and 29 CFR part 1911.

Sections 1926.58, 1926.59, 1926.60, and 1926.65 also issued under 5 U.S.C. 553 and 29 CFR part 1911.

Section 1926.61 also issued under 49 U.S.C. 1801–1819 and 5 U.S.C. 553.

Section 1926.62 also issued under sec. 1031, Public Law 102–550, 106 Stat. 3672 (42 U.S.C. 4853).

Section 1926.65 also issued under sec. 126, Public Law 99–499, 100 Stat. 1614 (reprinted at 29 U.S.C.A. 655 Note) and 5 U.S.C. 553.

### Subpart D—Occupational Health and Environmental Controls

■ 14. Add § 1926.58 to read as follows:

#### § 1926.58 COVID–19.

The requirements applicable to construction work under this section are identical to those set forth at 29 CFR 1910.501 Subpart U.

## PART 1928—OCCUPATIONAL SAFETY AND HEALTH STANDARDS FOR AGRICULTURE

■ 15. The authority citation for part 1928 is revised to read as follows:

**Authority:** Sections 4, 6, and 8 of the Occupational Safety and Health Act of 1970 (29 U.S.C. 653, 655, 657); Secretary of Labor's Order No. 12–71 (36 FR 8754), 8–76 (41 FR 25059), 9–83 (48 FR 35736), 1–90 (55 FR 9033), 6–96 (62 FR 111), 3–2000 (65 FR 50017), 5–2002 (67 FR 65008), 4–2010 (75 FR 55355), or 8–2020 (85 FR 58393), as applicable; and 29 CFR 1911.

Section 1928.21 also issued under 49 U.S.C. 1801–1819 and 5 U.S.C. 553.

### Subpart B—Applicability of Standards

■ 16. Amend § 1928.21 by adding paragraph (a)(8) to read as follows:

#### § 1928.21 Applicable standards in 29 CFR part 1910.

(a) * * *

(8) COVID–19—§ 1910.501, but only with respect to—

(i) Agricultural establishments where eleven (11) or more employees are engaged on any given day in hand-labor operations in the field; and

(ii) Agricultural establishments that maintain a temporary labor camp, regardless of how many employees are engaged on any given day in hand-labor operations in the field.

* * * * *

[FR Doc. 2021–23643 Filed 11–4–21; 8:45 am]

BILLING CODE 4510–26–P

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Medicare & Medicaid Services

### 42 CFR Parts 416, 418, 441, 460, 482, 483, 484, 485, 486, 491 and 494

[CMS–3415–IFC]

RIN 0938–AU75

# Medicare and Medicaid Programs; Omnibus COVID–19 Health Care Staff Vaccination

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), HHS.

**ACTION:** Interim final rule with comment period.

**SUMMARY:** This interim final rule with comment period revises the requirements that most Medicare- and Medicaid-certified providers and suppliers must meet to participate in the Medicare and Medicaid programs. These changes are necessary to help protect the health and safety of residents, clients, patients, PACE participants, and staff, and reflect lessons learned to date as a result of the COVID–19 public health emergency. The revisions to the requirements establish COVID–19 vaccination requirements for staff at the included Medicare- and Medicaid-certified providers and suppliers.

**DATES:**

*Effective date:* These regulations are effective on November 5, 2021.

*Implementation dates:* The regulations included in Phase 1 [42 CFR 416.51(c) through (c)(3)(i) and (c)(3)(iii) through (x), 418.60(d) through (d)(3)(i) and (d)(3)(iii) through (x), 441.151(c) through (c)(3)(i) and (c)(3)(iii) through (x), 460.74(d) through (d)(3)(i) and (d)(3)(iii) through (x), 482.42(g) through (g)(3)(i) and (g)(3)(iii) through (x), 483.80(d)(3)(v) and 483.80(i) through (i)(3)(i) and (i)(3)(iii) through (x), 483.430(f) through (f)(3)(i) and (f)(3)(iii) through (x), 483.460(a)(4)(v), 484.70(d) through (d)(3)(i) and (d)(3)(iii) through (x), 485.58(d)(4), 485.70(n) through (n)(3)(i) and (n)(3)(iii) through (x), 485.640(f) through (f)(3)(i) and (f)(3)(iii) through (x), 485.725(f) through (f)(3)(i) through (f)(3)(iii) through (x), 485.904(c) through (c)(3)(i) and (c)(3)(iii) through (x), 486.525(c) through (c)(3)(i) and (c)(3)(iii) through (x), 491.8(d) through (d)(3)(i) and (d)(3)(iii) through (x), 494.30(b) through (b)((3)(i) and (b)(3)(iii) through (x) must be implemented by December 6, 2021.

The regulations included in Phase 2 [42 CFR 416.51(c)(3)(ii), 418.60(d)(3)(ii), 441.151(c)(3)(ii), 460.74(d)(3)(ii), 482.42(g)(3)(ii), 483.80(i)(3)(ii), 483.430(f)(3)(ii), 484.70(d)(3)(ii), 485.70(n)(3)(ii), 485.640(f)(3)(ii), 485.725(f)(3)(ii), 485.904(c)(3)(ii), 486.525(c)(3)(ii), 491.8(d)(3)(ii), 494.30(b)(3)(ii)] must be implemented by January 4, 2022. Staff who have completed a primary vaccination series by this date are considered to have met these requirements, even if they have not yet completed the 14-day waiting period required for full vaccination.

*Comment date:* To be assured consideration, comments must be received at one of the addresses provided below, no later than 5 p.m. on January 4, 2022.

**ADDRESSES:** In commenting, please refer to file code CMS–3415–IFC.

Comments, including mass comment submissions, must be submitted in one of the following three ways (please choose only one of the ways listed):

1. *Electronically.* You may submit electronic comments on this regulation to *http://www.regulations.gov.* Follow the ''Submit a comment'' instructions.

2. *By regular mail.* You may mail written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–3415–IFC, P.O. Box 8016, Baltimore, MD 21244–8016.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

accommodations for some individual staff members in some circumstances. These laws do not interfere with or prevent employers from following the guidelines and suggestions made by CDC or public health authorities about steps employers should take to promote public health and safety in light of COVID–19, to the extent such guidelines and suggestions are consistent with the requirements set forth in this regulation. In other words, employers following CDC guidelines and the new requirements in this IFC may also be required to provide appropriate accommodations, to the extent required by Federal law, for employees who request and receive exemption from vaccination because of a disability, medical condition, or sincerely held religious belief, practice, or observance.

Vaccination against COVID–19 is a critical protective action for all individuals, especially health care workers, because the SARS-Cov-2 virus poses direct threats to patients, clients, residents, PACE program participants, and staff. COVID–19 disease at this time is resulting in much higher morbidity and mortality than seasonal flu.[150 151 152] These individual vaccinations provide protections to the health care system as a whole, protecting capacity and operations during disease outbreaks.

We also recognize ethical reasons to issue these vaccination requirements. All health care workers have a general ethical duty to protect those they encounter in their professional capacity.[153] Patient safety is a central tenet of the ethical codes and practice standards published by health care professional associations, licensure and certification bodies, and specialized industry groups. Health care workers also have a special ethical and professional responsibility to protect and prioritize the health and well-being of those they are caring for, as well as not exposing them to threats that can be avoided. This holds true not only for health care professionals, but also for all who provide health care services or choose to work in those settings. The ethical duty of receiving vaccinations is not new, as staff have long been required by employers to be vaccinated against certain diseases, such as influenza, hepatitis B, and other infectious diseases.

We are aware of concerns about health care workers choosing to leave their jobs rather than be vaccinated. While we understand that there might be a certain number of health care workers who choose to do so, there is insufficient evidence to quantify and compare adverse impacts on patient and resident care associated with temporary staffing losses due to mandates and absences due to quarantine for known COVID–19 exposures and illness. We encourage providers and suppliers, where possible, to consider on-site vaccination programs, which can significantly reduce barriers that health care staff may face in getting vaccinated, including transportation barriers, need to take time off of work, and scheduling. However, vaccine declination may continue to occur, albeit at lower rates, due to hesitancy among particular communities, and the Assistant Secretary for Planning and Evaluation (ASPE) indicates that vaccination promotion and outreach efforts focused on groups and communities who experience social risk factors could help address inequities.[154]

Despite these hesitations, many COVID–19 vaccination mandates have already been successfully initiated in a variety of health care settings, systems, and states. In general, workers across the economy are responding to mandates by getting vaccinated.[155] A large hospital system in Texas instituted a vaccine mandate and 99.5 percent of its staff received the vaccine. Further, only a few of their staff resigned rather than receive the vaccine.[156] A Detroit-based health system also instituted a vaccine mandate, and reported that 98 percent of the system's 33,000 workers were fully or partially vaccinated or in the process of obtaining a religious or medical exemption when the requirement went into effect, with exemptions comprising less than 1 percent of staffers.[157] In addition, a LTC parent corporation established a COVID–19 vaccine mandate for its more than 250 LTC facilities, leading to more than 95 percent of their workers being vaccinated. Again, they noted that very few workers quit their jobs rather than be vaccinated.[158] New York enacted a State-wide health care worker COVID–19 vaccine mandate and recorded a jump in vaccine compliance in the final days before the requirements took effect on October 1, 2021.[159]

We believe that the COVID–19 vaccine requirements in this IFC will result in nearly all health care workers being vaccinated, thereby benefiting all individuals in health care settings. This will greatly contribute to a reduction in the spread of and resulting morbidity and mortality from the disease, positive steps towards health equity, and an improvement in the numbers of health care staff who are healthy and able to perform their professional responsibilities. For individual staff members that have legally permitted justifications for exemption, the providers and suppliers covered by this IFC can address those individually.

## II. Provisions of the Interim Final Rule With Comment Period

Through this IFC, we are requiring that the following Medicare- and Medicaid-certified providers and suppliers, listed here in order of their appearance in 42 CFR, ensure that all applicable staff are vaccinated for COVID–19:

- Ambulatory Surgical Centers (ASCs)
- Hospices
- Psychiatric residential treatment facilities (PRTFs)
- Programs of All-Inclusive Care for the Elderly (PACE)

---

[150] Comparison of the characteristics, morbidity, and mortality of COVID–19 and seasonal influenza: a nationwide, population-based retrospective cohort study, The Lancet, Published Online December 17, 2020 *https://doi.org/10.1016/ S2213-2600(20)30527-0.*

[151] Comparative evaluation of clinical manifestations and risk of death in patients admitted to hospital with covid–19 and seasonal influenza: cohort study, BMJ 2020;371:m4677.

[152] Klompas, M, Pearson, M, and Morris, C. The Case for Mandating COVID–19 Vaccines for Health Care Workers. Annuals of Internal Medicine. Annals.org. Accessed at *https://www.acpjournals.org/doi/10.7326/M21-2366.* Accessed on August 30, 2021. Published on July 13, 2021.

[153] Emanuel, E and Skorton, D. Mandating COVID–19 Vaccination for Health Care Workers. Annuals of Internal Medicine. Annals.org. Accessed at *https://www.acpjournals.org/doi/10.7326/M21-3150.* Accessed on August 30, 2021. Article includes the ''Joint Statement in Support of COVID–19 Vaccine Mandates for All Workers in Health and Long-Term Care'' that is signed by 80 organizations.

[154] Kolbe A. Disparities in COVID–19 vaccination rates across racial and ethnic minority groups in the United States. Washington, DC: US Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation; 2021. *https://aspe.hhs.gov/system/files/pdf/265511/vaccination-disparities-brief.pdf.*

[155] *https://theconversation.com/half-of-unvaccinated-workers-say-theyd-rather-quit-than-get-a-shot-but-real-world-data-suggest-few-are-following-through-168447.*

[156] Emanuel, E and Skorton, D. Mandating COVID–19 Vaccination for Health Care Workers. Annuals of Internal Medicine. *Annuals.org.* Accessed *https://www.acpjournals.org/doi/10.7326/M21-3150.* Accessed on August 30, 2021. Article includes the ''Joint Statement in Support of COVID–19 Vaccine Mandates for All Workers in Health and Long-Term Care'' that is signed by 88 organizations.

[157] *https://www.bridgemi.com/michigan-health-watch/despite-protests-98-henry-ford-hospital-workers-get-covid-vaccinations* accessed 09/15/2021 at 2:24 p.m. EDT.

[158] Emanuel, E and Skorton, D. Mandating COVID–19 Vaccination for Health Care Workers. Annuals of Internal Medicine. Annals.org. Accessed at *https://www.acpjournals.org/doi/10.7326/M21-3150.* Accessed on August 30, 2021. Article includes the ''Joint Statement in Support of COVID–19 Vaccine Mandates for All Workers in Health and Long-Term Care'' that is signed by 88 organizations.

[159] *https://www.nytimes.com/2021/09/28/nyregion/vaccine-health-care-workers-mandate.html.*

- Hospitals (acute care hospitals, psychiatric hospitals, long term care hospitals, children's hospitals, hospital swing beds, transplant centers, cancer hospitals, and rehabilitation hospitals)
- Long Term Care (LTC) Facilities, including SNFs and NFs, generally referred to as nursing homes
- Intermediate Care Facilities for Individuals with Intellectual Disabilities (ICFs-IID)
- Home Health Agencies (HHAs)
- Comprehensive Outpatient Rehabilitation Facilities (CORFs)
- Critical Access Hospitals (CAHs)
- Clinics, rehabilitation agencies, and public health agencies as providers of outpatient physical therapy and speech-language pathology services
- Community Mental Health Centers (CMHCs)
- Home Infusion Therapy (HIT) suppliers
- Rural Health Clinics (RHCs)/Federally Qualified Health Centers (FQHCs)
- End-Stage Renal Disease (ESRD) Facilities

For discussion purposes, we have grouped these providers and suppliers into four categories below: (1) Residential congregate care facilities; (2) acute care settings; (3) outpatient clinical care and services; and (4) home-based care. We note that the appropriate term for the individual receiving care and/or services differs depending upon the provider or supplier. For example, for hospitals and CAHs, the appropriate term is patient, but for ICFs-IID, it is client. Further, LTC facilities have residents and PACE Programs have participants. The appropriate term is used when discussing each individual provider or supplier, but when we are discussing all or multiple providers and suppliers we will use the general term ''patient.'' Similarly, despite the different terms used for specific provider and supplier entities (such as campus, center, clinic, facility, organization, or program), when we are discussing all or multiple providers and suppliers, we will use the general term ''facility.''

*A. Provisions of the Interim Final Rule With Comment Period*

In this IFC, we are issuing a common set of provisions for each applicable provider and supplier. As there are no substantive regulatory differences across settings, we discuss the provisions broadly in this section of the rule, along with their rationales. In subsequent sections of the rule we discuss any unique considerations for each setting.

1. Staff Subject to COVID–19 Vaccination Requirements

The provisions of this IFC require applicable providers and suppliers to develop and implement policies and procedures under which all staff are vaccinated for COVID–19. Each facility's COVID–19 vaccination policies and procedures must apply to the following facility staff, regardless of clinical responsibility or patient contact and including all current staff as well as any new staff, who provide any care, treatment, or other services for the facility and/or its patients: Facility employees; licensed practitioners; students, trainees, and volunteers; and individuals who provide care, treatment, or other services for the facility and/or its patients, under contract or other arrangement. These requirements are not limited to those staff who perform their duties within a formal clinical setting, as many health care staff routinely care for patients and clients outside of such facilities, such as home health, home infusion therapy, hospice, PACE programs, and therapy staff. Further, there may be staff that primarily provide services remotely via telework that occasionally encounter fellow staff, such as in an administrative office or at an off-site staff meeting, who will themselves enter a health care facility or site of care for their job responsibilities. Thus, we believe it is necessary to require vaccination for all staff that interact with other staff, patients, residents, clients, or PACE program participants in any location, beyond those that physically enter facilities, clinics, homes, or other sites of care. Individuals who provide services 100 percent remotely, such as fully remote telehealth or payroll services, are not subject to the vaccination requirements of this IFC.

In the May 13, 2021 COVID–19 IFC, we included an extensive discussion on the subject of ''staff'' in relation to the LTC facility staff and to whom the testing, reporting, and education and offering of COVID–19 vaccine requirements of that rule might apply. In that discussion, we considered LTC facility staff to be those individuals who work in the facility on a regular (that is, at least once a week) basis. We note that this includes those individuals who may not be physically in the LTC facility for a period of time due to illness, disability, or scheduled time off, but who are expected to return to work. We also note that this description of staff differs from that in § 483.80(h), established for the LTC facility COVID–19 testing requirements in the September 2, 2020 COVID–19 IFC. As in the May 13, 2021 COVID–19 IFC, we considered applying the § 483.80(h) definition to the staff vaccination requirements in this rule, but previous public feedback and our own experience tells us the definition in § 483.80(h) was overbroad for these purposes.

Stakeholders across settings have reported that there are many individuals providing occasional health care services under arrangement, and that the requirements may be excessively burdensome for facilities to apply the definition at § 483.80(h) because it includes many individuals who have very limited, infrequent, or even no contact with facility staff and residents. Stakeholders also report that applying the staff vaccination requirements to these individuals who may only make unscheduled visits to the facility would be extremely burdensome. That said, the description in this rule still includes many of the individuals included in § 483.80(h). In addition to facility-employed staff, many facilities have services provided directly, on a regular basis, by individuals under contract or arrangement, including hospice and dialysis staff, physical therapists, occupational therapists, mental health professionals, social workers, and portable x-ray suppliers. Any of these individuals who provide such health care services at a facility would be included in ''staff'' for whom COVID–19 vaccination is now required as a condition for continued provision of those services for the facility and/or its patients.

In order to best protect patients, families, caregivers, and staff, we are not limiting the vaccination requirements of this IFC to individuals who are present in the facility or at the physical site of patient care based upon frequency. Regardless of frequency of patient contact, the policies and procedures must apply to all staff, including those providing services in home or community settings, who directly provide any care, treatment, or other services for the facility and/or its patients, including employees; licensed practitioners; students, trainees, and volunteers; and individuals who provide care, treatment, or other services for the facility and/or its patients, under contract or other arrangement. This includes administrative staff, facility leadership, volunteer or other fiduciary board members, housekeeping and food services, and others. We considered excluding individual staff members who are present at the site of care less frequently than once per week from these vaccination requirements, but were concerned that this might lead to

confusion or fragmented care. Therefore, any individual that performs their duties at any site of care, or has the potential to have contact with anyone at the site of care, including staff or patients, must be fully vaccinated to reduce the risks of transmission of SARS–CoV–2 and spread of COVID–19.

Facilities that employ or contract for services by staff who telework full-time (that is, 100 percent of their time is remote from sites of patient care, and remote from staff who do work at sites of care) should identify and monitor these individuals as a part of implementing the policies and procedures of this IFC, documenting and tracking overall vaccination status, but those individuals need not be subject to the vaccination requirements of this IFC. Note, however, that these individuals may be subject to other Federal requirements for COVID–19 vaccination.

We recognize that many infrequent services and tasks performed in or for a health care facility are conducted by ''one off'' vendors, volunteers, and professionals. Providers and suppliers are not required to ensure the vaccination of individuals who infrequently provide ad hoc non-health care services (such as annual elevator inspection), or services that are performed *exclusively off-site,* not at or adjacent to any site of patient care (such as accounting services), but they may choose to extend COVID–19 vaccination requirements to them if feasible. Other individuals who may infrequently enter a facility or site of care for specific limited purposes and for a limited amount of time, but do not provide services by contract or under arrangement, may include delivery and repair personnel.

We believe it would be overly burdensome to mandate that each provider and supplier ensure COVID–19 vaccination for all individuals who enter the facility. However, while facilities are not required to ensure vaccination of every individual, they may choose to extend COVID–19 vaccination requirements beyond those persons that we consider to be staff as defined in this rulemaking. We do not intend to prohibit such extensions and encourage facilities to require COVID–19 vaccination for these individuals as reasonably feasible.

When determining whether to require COVID–19 vaccination of an individual who does not fall into the categories established by this IFC, facilities should consider frequency of presence, services provided, and proximity to patients and staff. For example, a plumber who makes an emergency repair in an empty restroom or service area and correctly wears a mask for the entirety of the visit may not be an appropriate candidate for mandatory vaccination. On the other hand, a crew working on a construction project whose members use shared facilities (restrooms, cafeteria, break rooms) during their breaks would be subject to these requirements due to the fact that they are using the same common areas used by staff, patients, and visitors. Again, we strongly encourage facilities, when the opportunity exists and resources allow, to facilitate the vaccination of all individuals who provide services infrequently and are not otherwise subject to the requirements of this IFC.

2. Determining When Staff Are Considered ''Fully Vaccinated''

In consideration of the different vaccines available for COVID–19, we require that providers and suppliers ensure that staff are fully vaccinated for COVID–19, which, for purposes of these requirements, is defined as being 2 weeks or more since completion of a primary vaccination series. This definition of ''fully vaccinated'' is consistent with the CDC definition. Additionally, the completion of a primary vaccination series for COVID–19 is defined in the requirements as the administration of a single-dose vaccine, or the administration of all required doses of a multi-dose vaccine.

We note that the concept of a ''primary series'' is commonly understood with respect to vaccinations, particularly among health care professionals as well as the providers and suppliers regulated by this rule. For purposes of this IFC, and if permitted or recommended by CDC, COVID–19 vaccine doses from different manufacturers may be combined to meet the requirements for a primary vaccination series.

We further note that recommendations for booster doses currently vary by vaccine and population, and expect that they will continue to vary for the foreseeable future. We also require that providers and suppliers must have a process for tracking and securely documenting the COVID–19 vaccination status of any staff who have obtained any booster doses as recommended by the CDC. Additionally, some staff members may have been vaccinated during participation in a clinical trial, or in countries other than the U.S. We discuss the applicability of these less common vaccination pathways in section I.B. of this IFC.

Currently, for two of the three vaccines licensed or authorized for use in the U.S., the primary vaccination series consists of a defined number of doses administered a certain number of weeks apart; therefore, we have made this particular requirement effective in two different phases. We discuss these implementation phases further in section II.B. of this IFC, but note here that Phase 1, effective 30 days after publication of this IFC, includes the requirement that staff receive the first dose, or only dose as applicable, of a COVID–19 vaccine, or have requested or been granted an exemption to the vaccination requirements of this IFC. Phase 2, effective 60 days after publication of this IFC, requires that the primary vaccination series has been completed and that staff are fully vaccinated, except for those staff have been granted exemptions, or those staff for whom COVID–19 vaccination must be temporarily delayed, as recommended by CDC, due to clinical precautions and considerations. As discussed in section II.B. of this IFC, staff who have completed the primary series for the vaccine received by the Phase 2 implementation date are considered to have met these requirements, even if they have not yet completed the 14-day waiting period required for full vaccination.

3. Infection Prevention and Control

We require through this IFC that all applicable providers and suppliers have a process for ensuring the implementation of additional precautions, intended to mitigate the transmission and spread of COVID–19, for all staff who are not fully vaccinated for COVID–19. While every health care facility should be following recommended infection control and prevention measures as recommended by CDC as part of their provision of safe health care services, not all of the providers and suppliers subject to the requirements of this IFC have specific infection control and prevention regulations in place. Specifically, there are no infection prevention and control requirements for PRTFs, RHCs/FQHCs, and HIT suppliers. Therefore, for PRTFs, RHCs/FQHCs, and HIT suppliers, we require that they have a process for ensuring that they follow nationally recognized infection prevention and control guidelines intended to mitigate the transmission and spread of COVID–19. This process must include the implementation of additional precautions for all staff who are not fully vaccinated for COVID–19. For the providers and suppliers included in this IFC that are already subject to meeting specific infection prevention and control requirements on

an ongoing basis, we require that they have a process for ensuring the implementation of additional precautions, intended to mitigate the transmission and spread of COVID–19, for all staff who are not fully vaccinated for COVID–19.

4. Documentation of Staff Vaccinations

In order to ensure that providers and suppliers are complying with the vaccination requirements of this IFC, we are requiring that they track and securely document the vaccination status of each staff member, including those for whom there is a temporary delay in vaccination, such as recent receipt of monoclonal antibodies or convalescent plasma. Vaccine exemption requests and outcomes must also be documented, discussed further in section II.A.5. of this IFC. This documentation will be an ongoing process as new staff are onboarded.

While provider and supplier staff may not have personal medical records on file with their employer, all staff COVID–19 vaccines must be appropriately documented by the provider or supplier. Examples of appropriate places for vaccine documentation include a facilities immunization record, health information files, or other relevant documents. All medical records, including vaccine documentation, must be kept confidential and stored separately from an employer's personnel files, pursuant to ADA and the Rehabilitation Act.

Examples of acceptable forms of proof of vaccination include:

- CDC COVID–19 vaccination record card (or a legible photo of the card),
- Documentation of vaccination from a health care provider or electronic health record, or
- State immunization information system record.

If vaccinated outside of the U.S., a reasonable equivalent of any of the previous examples would suffice.

Providers and suppliers have the flexibility to use the appropriate tracking tools of their choice. For those who would like to use it, CDC provides a staff vaccination tracking tool that is available on the NHSN website (*https://www.cdc.gov/nhsn/hps/weekly-covid-vac/index.html*). This is a generic Excel-based tool available for free to anyone, not just NHSN participants, that facilities can use to track COVID–19 vaccinations for staff members.

5. Vaccine Exemptions

While nothing in this IFC precludes an employer from requiring employees to be fully vaccinated, we recognize that there are some individuals who might be eligible for exemptions from the COVID–19 vaccination requirements in this IFC under existing Federal law. Accordingly, we require that providers and suppliers included in this IFC establish and implement a process by which staff may request an exemption from COVID–19 vaccination requirements based on an applicable Federal law. Certain allergies, recognized medical conditions, or religious beliefs, observances, or practices, may provide grounds for exemption. With regard to recognized clinical contraindications to receiving a COVID–19 vaccine, facilities should refer to the CDC informational document, *Summary Document for Interim Clinical Considerations for Use of COVID–19 Vaccines Currently Authorized in the United States,* accessed at *https://www.cdc.gov/vaccines/covid-19/downloads/summary-interim-clinical-considerations.pdf*.

As described in section I.I. of this IFC, there are Federal laws, including the ADA, section 504 of the Rehabilitation Act, section 1557 of the ACA, and Title VII of the Civil Rights Act, that prohibit discrimination based on race, color, national origin, religion, disability and/or sex, including pregnancy. We recognize that, in some circumstances, employers may be required by law to offer accommodations for some individual staff members. Accommodations can be addressed in the provider or supplier's policies and procedures.

Applicable staff of the providers and suppliers included in this IFC must be able to request an exemption from these COVID–19 vaccination requirements based on an applicable Federal law, such as the Americans with Disabilities Act (ADA) and Title VII of the Civil Rights Act of 1964. Providers and suppliers must have a process for collecting and evaluating such requests, including the tracking and secure documentation of information provided by those staff who have requested exemption, the facility's decision on the request, and any accommodations that are provided.

Requests for exemptions based on an applicable Federal law must be documented and evaluated in accordance with applicable Federal law and each facility's policies and procedures. As is relevant here, this IFC preempts the applicability of any State or local law providing for exemptions to the extent such law provides broader exemptions than provided for by Federal law and are inconsistent with this IFC.

For staff members who request a medical exemption from vaccination, all documentation confirming recognized clinical contraindications to COVID–19 vaccines, and which supports the staff member's request, must be signed and dated by a licensed practitioner, who is not the individual requesting the exemption, and who is acting within their respective scope of practice as defined by, and in accordance with, all applicable State and local laws. Such documentation must contain all information specifying which of the authorized COVID–19 vaccines are clinically contraindicated for the staff member to receive and the recognized clinical reasons for the contraindications; and a statement by the authenticating practitioner recommending that the staff member be exempted from the facility's COVID–19 vaccination requirements based on the recognized clinical contraindications.

Under Federal law, including the ADA and Title VII of the Civil Rights Act of 1964 as noted previously, workers who cannot be vaccinated or tested because of an ADA disability, medical condition, or sincerely held religious beliefs, practice, or observance may in some circumstances be granted an exemption from their employer. In granting such exemptions or accommodations, employers must ensure that they minimize the risk of transmission of COVID–19 to at-risk individuals, in keeping with their obligation to protect the health and safety of patients. Employers must also follow Federal laws protecting employees from retaliation for requesting an exemption on account of religious belief or disability status. For more information about these situations, employers can consult the Equal Employment Opportunity Commission's website at *https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws*.

We also direct providers and suppliers to the Equal Employment Opportunity Commission (EEOC) Compliance Manual on Religious Discrimination [160] for information on evaluating and responding to such requests. While employers have the flexibility to establish their own processes and procedures, including forms, we point to The Safer Federal Workforce Task Force's ''request for a religious exception to the COVID–19 vaccination requirement'' template as an example. This template can be viewed at *https://*

[160] *https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination.*





EPA-APPROVED FLORIDA SOURCE-SPECIFIC REQUIREMENTS—Continued

| Name of source | Permit No. | State effective date | EPA approval date | Explanation |
|---|---|---|---|---|
| EnviroFocus Technologies, LLC ........ | Air Construction Permit No. 0570057–37–AC. | 11/6/2019 | 6/14/2021, 86 FR 29949 ..... | Only incorporating the following conditions: Section 3, Subsection B, Specific Conditions 2 and 3a; Section 3, Subsection C, Specific Condition 1; and Section 3, Subsection D, Specific Condition 1. |

* * * * *

[FR Doc. 2023–04013 Filed 2–28–23; 8:45 am]

BILLING CODE 6560–50–P

**DEPARTMENT OF LABOR**

**Office of Federal Contract Compliance Programs**

**41 CFR Part 60–1**

**RIN 1250–AA09**

## Rescission of Implementing Legal Requirements Regarding the Equal Opportunity Clause's Religious Exemption Rule

**AGENCY:** Office of Federal Contract Compliance Programs, Labor.

**ACTION:** Final rule; rescission.

**SUMMARY:** This action finalizes the proposal of the Office of Federal Contract Compliance Programs (OFCCP) to rescind the final rule titled ''Implementing Legal Requirements Regarding the Equal Opportunity Clause's Religious Exemption,'' which took effect on January 8, 2021. This rescission removes the regulations established by that rule.

**DATES:** This final rule is effective on March 31, 2023.

**FOR FURTHER INFORMATION CONTACT:** Tina Williams, Director, Division of Policy and Program Development, Office of Federal Contract Compliance Programs, 200 Constitution Avenue NW, Room C–3325, Washington, DC 20210. Telephone: (202) 693–0104 (voice) or (202) 693–1337 (TTY).

**SUPPLEMENTARY INFORMATION:**

### I. Executive Summary

OFCCP enforces Executive Order 11246, which prohibits Federal Government contractors and subcontractors from discriminating against employees in a manner that would impair the economy and efficiency of work performed on government contracts and would allow Federal tax dollars to be used to deny equal employment opportunities. Section 202 of Executive Order 11246, as amended, requires every non-exempt contract and subcontract to include an equal opportunity clause, which specifies the nondiscrimination and affirmative action obligations each contractor or subcontractor assumes as a condition of its Government contract or subcontract. Among other obligations, each contractor agrees, as a condition of its Government contract, not to discriminate in employment on the basis of race, color, religion, sex, sexual orientation, gender identity, or national origin.

As amended in 2002, Executive Order 11246 includes a limited exemption for certain religious organizations that is expressly modeled on the religious exemption in Title VII of the Civil Rights Act of 1964. Since 2003, this religious exemption has been included in OFCCP's regulations at 41 CFR 60–1.5(a)(5). For over 17 years, under the administrations of both President George W. Bush and President Barack Obama, OFCCP's policy was to determine the scope and applicability of the religious exemption, if invoked, by applying Title VII case law and principles to the facts and circumstances of each situation. In December 2020, OFCCP promulgated a rule that purported to clarify the scope and application of the Executive Order 11246 religious exemption (hereinafter ''2020 rule''). On balance, however, the 2020 rule increased confusion and uncertainty about the religious exemption, largely because it departed from and questioned longstanding Title VII precedents. Upon further consideration, OFCCP now believes that this could have the effects of diminishing the economy and efficiency of work performed on Federal contracts and weakening nondiscrimination protections for workers. With the present action, for the reasons explained below, OFCCP is rescinding the entire 2020 rule so that the agency can return to its longstanding approach of aligning the Executive Order 11246 religious exemption with Title VII case law as applied to the facts and circumstances of each situation. OFCCP remains committed to protecting religious freedom in accordance with applicable law and will continue to provide any needed compliance assistance on the religious exemption.

### II. Background

Executive Order 11246, as amended, and its predecessors reflect the Government's longstanding policy of prohibiting Federal contractors from engaging in discrimination that undermines efficiency and economy as well as equal employment opportunity. *See, e.g.,* E.O. 8802, 6 FR 3109 (June 27, 1941) (''reaffirm[ing] the policy of the United States that there shall be no discrimination in the employment of workers in defense industries or government because of race, creed, color, or national origin''); E.O. 10479, 18 FR 4899 (Aug. 18, 1953) (reiterating ''the policy of the United States Government to promote equal employment opportunity for all qualified persons employed or seeking employment on government contracts because such persons are entitled to fair and equitable treatment in all aspects of employment on work paid for from public funds''); E.O. 10925, 26 FR 1977 (Mar. 8, 1961) (describing it as ''the plain and positive obligation of the United States Government to promote and ensure equal opportunity for all qualified persons, without regard to race, creed, color, or national origin, employed or seeking employment with the Federal Government and on government contracts''); E.O. 13672, 79 FR 42971 (July 23, 2014) (amending Executive Order 11246 to include sexual orientation and gender identity to ''provide for a uniform policy for the Federal Government to prohibit discrimination and take further steps to promote economy and efficiency in Federal Government procurement''). Presidents have long implemented this nondiscrimination policy, which also ensures that taxpayer funds are not used to discriminate, especially in the performance of functions for the Government itself and, thus, for the public, pursuant to the Federal Property and Administrative Services Act of 1949 (Procurement Act). *See* 40 U.S.C. 101, 121(a); *Contractors Ass'n of E. Pa.* v.

employer test, its other definitions, its inappropriately broad rule of construction, and its inappropriately categorical approach to RFRA analysis are distinct and function independently of each other.

*A. Reasons for Rescission of the Rule*

1. Unprecedented Religious Employer Test

Under both Title VII and Executive Order 11246, an employer that is determined to be a ''religious corporation, association, educational institution, or society'' qualifies for the religious exemption. As OFCCP noted in its rescission proposal, there is extensive Title VII case law interpreting this term. The courts' tests are not uniform, but in general they weigh the following factors to determine whether the employer's purpose and character are primarily religious:

(1) whether the entity operates for a profit, (2) whether it produces a secular product, (3) whether the entity's articles of incorporation or other pertinent documents state a religious purpose, (4) whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue, (5) whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees, (6) whether the entity holds itself out to the public as secular or sectarian, (7) whether the entity regularly includes prayer or other forms of worship in its activities, (8) whether it includes religious instruction in its curriculum, to the extent it is an educational institution, and (9) whether its membership is made up by coreligionists.

*LeBoon* v. *Lancaster Jewish Cmty. Ctr.,* 503 F.3d 217, 226 (3d Cir. 2007); *see also, e.g., Garcia* v. *Salvation Army,* 918 F.3d 997, 1003 (9th Cir. 2019); *Spencer* v. *World Vision, Inc.,* 633 F.3d 723, 724 (9th Cir. 2011) (per curiam); *Hall* v. *Baptist Mem'l Health Care Corp.,* 215 F.3d 618, 624 (6th Cir. 2000); *Killinger* v. *Samford Univ.,* 113 F.3d 196, 198–99 (11th Cir. 1997). Historically, this case law has guided both OFCCP and contractors in determining whether an employer is entitled to the Executive Order 11246 religious exemption. The 2020 rule, however, adopted a religious employer test that no court has applied under Title VII. *See* 85 FR 79371 (codified at 41 CFR 60–1.3).

In adopting this new test, the preamble to the 2020 rule characterized the multifactor approach described above as being among Federal appellate courts' ''confusing variety of tests, [which] themselves often involve unclear or constitutionally suspect criteria.'' *Id.* at 79331. It endorsed two concurring opinions in *Spencer* v. *World Vision,* which concluded that ''assess[ing] the religiosity of an organization's various characteristics[ ] can lead the court into a 'constitutional minefield.' '' 84 FR 41681 (quoting *World Vision,* 633 F.3d at 730 (O'Scannlain, J., concurring), and citing *World Vision,* 633 F.3d at 741 (Kleinfeld, J., concurring)); *see also* 85 FR 79361. The preamble asserted that courts' typical inquiry into whether a contractor is ''primarily religious'' requires a ''*comparison* between the amount of religious and secular activity at an organization,'' which the preamble asserted created constitutional problems. 85 FR 79336. The 2020 rule thus adopted a definition of the term ''religious corporation, association, educational institution, or society'' that departed from the longstanding judicial approach of evaluating whether the employer's purpose and character are primarily religious. The 2020 rule further provided that for-profit organizations could qualify for the religious exemption if they presented ''other strong evidence'' that they possessed ''a substantial religious purpose.'' *Id.* at 79371 (codified at 41 CFR 60–1.3).

The 2020 rule's creation of a test that deviated from all established Title VII interpretations was the principal reason OFCCP proposed rescinding the 2020 rule. As OFCCP explained in its proposal, the religious employer test adopted by the 2020 rule cannot be squared with Executive Order 13279's incorporation of Title VII as the touchstone for the Executive Order 11246 religious exemption.

Numerous commenters agreed with OFCCP's concerns about the 2020 rule's religious employer test on both legal and policy grounds. These commenters overwhelmingly viewed the test as inappropriately broad; many commenters, including a group of state attorneys general (plaintiffs in one of the cases challenging the 2020 rule), a religious organization, and a lesbian, gay, bisexual, transgender, and queer (LGBTQ) rights advocacy organization, asserted that the 2020 rule's expansive test was inconsistent with both congressional intent and judicial interpretations under Title VII. Several of these commenters further asserted that the 2020 rule's departures from precedent, described in more detail below, were inadequately justified. Commenters including a contractor association, a civil liberties advocacy organization, an organization that advocates separation of church and state, and a think tank further asserted that the 2020 rule's religious employer test, in deviating from Title VII precedent, had increased rather than decreased confusion about the application of the Executive Order 11246 religious exemption. As the contractor association commented:

Whether an employer is entitled to an exemption based on religion is determined by the statutory text of Title VII and case law interpreting it. The OFCCP must be guided by these principles in interpreting the scope and application of Executive Order 11246. The test created by the 2020 rule produces unnecessary confusion and uncertainty by departing from established legal principles.

Some commenters observed that the 2020 rule deviated even from the *World Vision* opinions it commended. For example, a legal think tank stated that, rather than adopting the religious employer test from the *World Vision* per curiam opinion or the test from either concurring opinion, the 2020 rule ''instead forge[d] its own test that would qualify more types of contractors for the exemption.'' An LGBTQ rights advocacy organization noted that, despite the 2020 rule's praise for the test proposed in Judge O'Scannlain's concurring opinion, the 2020 rule rejected Judge O'Scannlain's prerequisite that the employer be nonprofit—but, the commenter asserted, ''[o]mitting the requirement that an entity seeking a religious exemption be not-for-profit is not a minor alteration.'' Commenters also criticized the 2020 rule for, in their view, reducing the objectivity of the factors described in *World Vision* for determining whether an employer qualifies for the religious exemption. A civil liberties advocacy organization, for example, asserted that the 2020 rule relied ''only on the employer's own characterization of its activities, with no minimum, objective standards of evidence required,'' which the commenter asserted ''makes it easier for employers to claim the exemption.'' Similarly, a women's rights legal advocacy organization asserted that ''under the 2020 Rule, OFCCP had made clear that it would almost certainly not challenge a contractor's assertion that its sex discrimination was based on a religious belief, expressing a deference to any assertion of religious motivation that further tilted the scales towards allowing sex discrimination in federal contracting.'' An LGBTQ rights advocacy organization agreed that the preamble to the 2020 rule rendered certain factors—such as being organized for a religious purpose and holding itself out as religious—''essentially meaningless'' by lowering the standards by which organizations could demonstrate that they satisfied the factors.

Many commenters, including a contractor association, an affirmative

diminished protections because their employers may now claim the religious exemption under the 2020 rule.

OFCCP also recognizes that some commenters disagreed with its proposal to return to applying the religious exemption only to those contractors whose purpose and character are primarily religious, in accordance with the typical approach in Title VII case law. With regard specifically to commenters' assertions that a ''primarily religious'' inquiry raises constitutional concerns, OFCCP has carefully considered the issue, including reviewing the case law cited by commenters. As a threshold matter, although the 2020 rule's preamble asserted that the test avoided constitutional difficulties by using ''objective'' criteria—a claim echoed by some commenters—OFCCP notes that the test actually included factors that require subjective ''religious characterizations'' but simply defer to contractors' views of those factors. *See* 85 FR 79334. Moreover, OFCCP believes it is significant that most courts and the EEOC, as discussed next, have not viewed the constitutional concerns that motivated the adoption of the 2020 rule's test as preventing use of the traditional ''primarily religious'' inquiry.[5] Commenters generally supported their points in this area by citing to non-Title VII case law (*e.g., Thomas* v. *Review Board, Colorado Christian University* v. *Weaver, University of Great Falls v. NLRB*), none of which addresses the well-established Title VII religious employer test, and employment discrimination cases in which courts applied the First Amendment ministerial exception (*Our Lady of Guadalupe School* v. *Morissey-Berru, McClure v. Salvation Army*). However, none of these cases supports the conclusion that serious First Amendment questions arise by following Title VII precedent to evaluate whether contractors' purpose and character are primarily religious.

OFCCP also disagrees that this aspect of its rescission proposal is inconsistent with the EEOC's 2021 Compliance Manual, which provides expressly that the Title VII religious exemption ''applies only to those organizations whose 'purpose and character are primarily religious.' '' EEOC, Compliance Manual on Religious Discrimination, sec. 12–1.C.1 (quoting *Garcia* v. *Salvation Army,* 918 F.3d 997, 1003 (9th Cir. 2019)). EEOC's guidance then states that courts consider and weigh '' 'the religious and secular characteristics' of the entity,'' quoting *Hall,* 215 F.3d at 624 (one of the cases some commenters asserted did not endorse the ''primarily religious'' inquiry), and citing, among other cases, *Killinger,* 113 F.3d at 198–99 (the other case some commenters asserted did not endorse the ''primarily religious'' inquiry). The guidance explains that ''[c]ourts have articulated different factors to determine whether an entity is a religious organization'' and then proceeds to list the exact same nine *LeBoon* factors that OFCCP laid out in its proposal and repeats above, as well as to cite the same cases OFCCP cited in support of the approach, including *Hall* and *Killinger.* EEOC, Compliance Manual on Religious Discrimination, sec. 12–1.C.1; *see also, e.g., Bear Creek Bible Church* v. *EEOC,* 571 F. Supp. 3d 571, 591 (N.D. Tex. Nov. 22, 2021) (noting that ''[a]t least ten courts'' have adopted these nine factors), *appeal pending,* No. 22–10145 (5th Cir.).

In this respect, then, EEOC's guidance is consistent with both OFCCP's proposal and comments from numerous commenters observing that there is a substantial body of case law in which courts—including the Ninth Circuit post–*World Vision*—have applied the traditional Title VII test to identify employers with primarily religious purpose and character without infringing on employers' religious liberties or assessing the validity of doctrinal questions. *See, e.g., Garcia,* 918 F.3d 997; *LeBoon,* 503 F.3d 217; *Hall,* 215 F.3d 618; *Killinger,* 113 F.3d 196. Only in a parenthetical description in a footnote does EEOC's guidance mention Judge O'Scannlain's ''constitutional minefield'' concern (*i.e.,* that ''several of the *LeBoon* factors could be constitutionally troublesome if applied to this case,'' *World Vision,* 633 F.3d at 730 (O'Scannlain, J. concurring)). EEOC, Compliance Manual on Religious Discrimination, sec. 12–1.C.1 n.59. OFCCP does not believe it is necessary to abandon the ''primarily religious'' inquiry, which courts have long applied while avoiding any constitutional minefields.

OFCCP also believes the comments criticizing the rescission proposal as it relates to for-profit contractors are misplaced. For example, nothing in OFCCP's proposal is inconsistent with the statement in EEOC's guidance ''that engaging in secular activities does not disqualify an employer from being a 'religious organization' within the meaning of the Title VII statutory exemption.'' *Id.* sec. 12–1.C.1. As noted above, both OFCCP's approach and EEOC's guidance require that a qualifying employer have a *primarily* religious purpose and character. Further, OFCCP agrees with the EEOC that ''Title VII case law has not definitively addressed whether a for-profit corporation that satisfies the other factors can constitute a religious corporation under Title VII.'' *Id.* As explained in OFCCP's proposal, Title VII case law gives weight to an entity's nonprofit status as one factor in a multifactor analysis but generally does not treat it as an absolute prerequisite. *See, e.g., LeBoon,* 503 F.3d at 226; *Hall,* 215 F.3d at 624; *Killinger,* 113 F.3d at 198–99. In fact, Judge O'Scannlain's concurring opinion in *World Vision* was unusual in that it would have explicitly limited the religious exemption to nonprofit entities. *See World Vision,* 633 F.3d at 734 (O'Scannlain, J., concurring). As Judge O'Scannlain explained, when the Supreme Court upheld the Title VII religious exemption against constitutional challenge in 1987, it ''expressly left open the question of whether a for-profit entity could ever qualify for a Title VII exemption.'' *Id.* at n.13 (citing *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints* v. *Amos,* 483 U.S. 327, 349 (1987) (O'Connor, J., concurring)).

Having considered all relevant comments, OFCCP believes that the 2020 rule's adoption of an unprecedented religious employer test was unwarranted. Despite the 2020 rule's stated desire to provide clarity, the standard that the 2020 rule adopted departed from Title VII case law and principles, creating a lack of clarity as to the applicable legal standards. With this rescission, OFCCP will return to its previous approach, which makes the Executive Order 11246 religious exemption available to employers whose purpose and character are primarily religious, using the multi-factor *LeBoon* inquiry. OFCCP will consider the applicability of the religious exemption to the facts of each case in accordance with Title VII case law. This will provide contractors and potential contractors with the clarity of a single religious employer test under both Executive Order 11246 and Title VII.

2. Exemption of Unlawful Employment Actions

Under both Title VII and Executive Order 11246, qualifying religious

[5] Courts have occasionally declined to apply Title VII to claims of sex discrimination where doing so ''would involve the court in evaluating violations of Church doctrine,'' such as by requiring the court ''to compare the relative severity of violations of religious doctrine.'' *Curay-Cramer* v. *Ursuline Academy of Wilmington, Delaware, Inc.,* 450 F.3d 130, 141–42 (3d Cir. 2006). As discussed in the text, however, courts and administrators have been able to avoid inquiry into such doctrinal questions in determining whether a contractor's purpose and character are primarily religious.

that it was able to assert the religious exemption while complying with the other Executive Order 11246 obligations it agreed to as a Federal contractor. And another religious university commented that it had ''successfully performed under federal contracts in various academic and scientific areas.''

*B. Effects of Rescission*

OFCCP's rescission proposal stated that, if the 2020 rule were rescinded, OFCCP would return to its policy and practice of interpreting and applying the religious exemption in section 204(c) of Executive Order 11246, as codified in OFCCP's regulations at 41 CFR 60–1.5(a)(5), in accordance with Title VII principles and case law. OFCCP stated that it would abide by relevant religious liberty obligations and would consider any RFRA claims raised by contractors on a case-by-case basis and refrain from applying any regulatory requirement to a case in which it would violate RFRA.

Many commenters who opposed rescission believed that rescinding the 2020 rule would have negative effects. These commenters believed that rescission would undermine employers' religious freedom by revoking key religious liberty protections for their employment decisions. Some commenters, including several religious universities and a religious advocacy organization, asserted that OFCCP's rescission proposal did not adequately account for the constitutional protections for religious employers, which they stated extend further than the ministerial exception. Several of these commenters asserted that rescission of the 2020 rule would impermissibly force religious entities to choose between maintaining their faith and participating in Federal contracts. Many of these commenters asserted that OFCCP was without authority to limit religious freedom protections. Commenters including U.S. Senators and a religious advocacy organization cited cases including *Fulton* v. *City of Philadelphia,* 141 S. Ct. 1868 (2021); *Trinity Lutheran Church of Columbia, Inc.* v. *Comer,* 137 S. Ct. 2012 (2017); and *Thomas* v. *Review Board,* 450 U.S. 707 (1981), to support their assertion that faith-based organizations cannot be forced to choose between exercising religion and participating in Government programs.

Many commenters who opposed rescission also asserted that rescinding the 2020 rule, which they viewed as providing clarity and predictability to the regulated community, would lead to confusion and uncertainty. A religious university, for example, asserted that OFCCP's rescission proposal would remove helpful regulations and ''leave nothing in their place'' to provide ''guidance . . . as to the meaning and scope of the religious exemption.'' A few commenters expressed concern that OFCCP, in the absence of regulations to guide and constrain its authority, would simply indulge its ''policy preferences,'' such as by ''target[ing] religious groups and individuals that do not comply with their agenda,'' in the words of a religious organization. A religious advocacy organization asserted that, despite the administration's ''claims to promote diversity,'' rescission of the 2020 rule would entail ''simultaneously shunning and singling-out religious organizations and companies who represent Americans from incredibly diverse races, ethnic groups, backgrounds, and socioeconomic status.'' On a more neutral note, U.S. Senators commented that ''[i]t remains a basic principle of public policy and good governance that federal contractors deserve to understand at the outset of the contract how the terms of such contract will be interpreted and enforced.''

OFCCP appreciates contractors' and potential contractors' desire for clarity and certainty regarding the scope and application of the religious exemption. OFCCP does not agree that leaving the 2020 rule in place would achieve clarity and certainty for all stakeholders. As discussed above and as asserted by many other commenters, the 2020 rule's departure from Title VII case law and principles actually increased confusion among contractors and created uncertainty for workers about their protections from discrimination. OFCCP's rescission of the entire 2020 rule is necessary to achieve consistency with the text of Executive Order 11246 and with Title VII case law and principles, as discussed above in response to comments. As many commenters thus agreed, with rescission of the entire 2020 rule, religious contractors will no longer be subject to different exemption standards under Executive Order 11246 and Title VII, and workers can avail themselves of consistent protections. Furthermore, OFCCP is committed to promoting religious liberty, and there is simply no basis for any concern that OFCCP intends to target, shun, or otherwise be hostile to religious contractors. OFCCP fully intends to continue respecting contractors' religious liberty interests as well as the interests of other stakeholders, including the employees of religious contractors.

OFCCP also notes that commenters who opposed rescission, although they predicted that rescission would have negative effects, did not claim serious reliance interests that would be harmed by rescission. This may be because, as a religious advocacy organization commented, the 2020 rule has not been in place long enough ''to affect the universe of potential contractors who submit their bids in cycles.'' Further, as noted in a comment submitted by a state tradeswomen organization, a national labor union LGBTQ constituency group, and a national labor union, the 2020 rule was challenged in court within a few weeks of its effective date, and the Department shortly thereafter confirmed in a public filing that it intended to propose rescission of the 2020 rule. Defs.' Unopposed Mot. for Stay, *Or. Tradeswomen, Inc.* v. *U.S. Dep't of Labor,* No. 21–cv–00089 (D. Or. filed Jan. 21. 2021), ECF No. 15. By contrast, as asserted by a group of state attorneys general, the 2020 rule harmed the reliance interests of employees of Federal contractors ''that will newly claim the exemption,'' given that those employees depend ''on the protections of E.O. 11,246 to shield them from their employer imposing its religious tenets in the workplace.'' OFCCP believes that rescission of the 2020 rule will create more certainty for employees.

OFCCP also carefully considered commenters' concerns that rescinding the 2020 rule would impermissibly undermine employers' religious freedom. At the outset, OFCCP reiterates that rescission will simply return the agency to its longstanding approach to the religious exemption, which entails following Title VII principles and case law—that is, interpreting and applying the religious exemption in accordance with precedents in which courts have not impermissibly undermined employers' religious freedom. OFCCP has also reviewed the cases that commenters cited in support of their concerns about employers' religious liberty, and OFCCP believes that rescinding the 2020 rule is consistent with those decisions.

As discussed above, OFCCP and some commenters view rescission as consistent with *Fulton,* which emphasized the inadequacy of a categorical approach to religious exemptions by noting that the relevant question ''is not whether the [government] has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception to [the particular religious claimant].'' 141 S. Ct. at 1881. With regard to *Trinity Lutheran,* a labor union commented that the Court's decision there ''simply affirmed that the Free Exercise clause ensures religious institutions are

FILED

MAY 1 9 2023

JOAN M. GILMER
CIRCUIT CLERK, ST. LOUIS COUNTY

**IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS**
**STATE OF MISSOURI**

| | | |
|---|---|---|
| KAREN RUBY BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | Cause No. 18SL-CC03624 |
| | ) | |
| v. | ) | Division No. 12 |
| | ) | |
| MERCY CLINIC EAST COMMUNITIES, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Before the Court is the Motion for Summary Judgment filed by Defendant Mercy Clinic East Communities ("Mercy"). The Court, having considered the pleadings and submissions in the summary judgment record, is fully advised. The Court now rules as follows.

*Background*

Plaintiff Karen Ruby Brown ("Brown") filed her First Amended Petition effective as of May 6, 2019. The Order and Judgment of that date, which granted leave to file the amended pleading, also entered partial summary judgment with respect to Counts III and IV of the First Amended Petition. Those Counts set forth claims under Missouri's Whistleblower Protection Act, section 285.575, R.S.Mo. (the "WPA").[1] Count V of the First Amended Petition, setting forth a claim of promissory estoppel, was dismissed without prejudice.

In light of the foregoing, the only remaining claims are Counts I and II of the First Amended Petition, which are common law claims for wrongful discharge. Mercy contends that Brown's common law wrongful discharge claims were abrogated by the WPA. Mercy further contends that, even if Brown could pursue a common law wrongful discharge claim, the

[1] The WPA expressly excludes from its definition of "employer" any "corporations and associates owned or operated by religious or sectarian organizations." § 285.575.2(2). There is no dispute that Defendant Mercy falls within that description, and that therefore a statutory action may not be brought against it under the Act.

undisputed facts show that no wrongful discharge occurred, entitling Mercy to judgment as a matter of law.

*Brown's Common Law Claims*

In the remaining Counts I and II, Brown alleges she is an Advanced Practice Registered Nurse who was wrongfully terminated in November, 2017 from her employment with Mercy. She claims she was discharged based on her reporting of wrongdoing and violations of law and public policy, and her refusal to perform illegal acts.

Missouri is an at-will employment state. The at-will employment doctrine has been firmly established in Missouri for over 130 years. *See Finger v. Koch & Schilling Brewing Co.*, 13 Mo. App. 310, 311 (Mo. App. St. Louis 1883). One of the exceptions to the employment at will rule recognized by the courts is the common law public policy exception. That exception was articulated in 1985 by the Western District in *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859, 877-78 (Mo. App. W.D. 1985). It was not recognized by the Missouri Supreme Court until 2010. *See Fleshner v. Pepose Vision Institute, P.C.*, 304 S.W.3d 81, 92 (Mo. banc 2010); *Keveney v. Missouri Military Acad.*, 304 S.W.3d 98, 101 (Mo. banc 2010); and *Margiotta v. Christian Hosp. Northeast Northwest*, 315 S.W.3d 342, 346 (Mo. banc 2010).

Prior to enactment of the WPA, Missouri courts recognized four categories of cases that are encompassed within the public policy exception to at-will employment: (1) termination of employees who refuse to obey directions to commit a crime or to act contrary to public policy; (2) termination of employees who report wrongdoing or violations of law or public policy by their employers or fellow employees; (3) termination of employees who engage in actions normally encouraged by public policy, such as reporting to jury duty; and (4) termination of employees who file claims for workers' compensation. *Jones v. Galaxy 1 Marketing, Inc.*, 478

S.W.3d 556, 563 (Mo. App. E.D. 2015). In the case at hand, Ms. Brown claims that her claims fall within the first two categories recognized under the public policy exception – termination for refusal to commit a crime and for whistleblowing. The question is whether the WPA precludes her bringing a common law action for wrongful termination.

*The WPA's Effect on Brown's Common Law Claims*

Mercy previously moved to dismiss Counts I and II based on the argument that the WPA abrogated Brown's common law rights, leaving her without a remedy. By Order entered September 9, 2019, this Court rejected that argument. Mercy invites the Court to reconsider that ruling in the summary judgment context. The issue remains the same – when the General Assembly enacted the WPA, specifically stating that the WPA, together with chapter 213 and chapter 287, "shall provide the exclusive remedy for any and all claims of unlawful employment practices," did it intend to abrogate common law claims for wrongful discharge of whistleblowers who were employed by entities not within the definition of "employer" under the WPA?

The General Assembly stated the intent behind the WPA:

> This section is intended to codify the existing common law exceptions to the at-will employment doctrine and to limit their further expansion by the courts. This section, in addition to chapter 213 and chapter 287, shall provide the exclusive remedy for any and all claims of unlawful employment practices.

§ 285.575.3, R.S.Mo. As discussed in the Court's September 9, 2019 Order, the legislative intent of the WPA is clear. The General Assembly meant for the WPA to provide the exclusive remedy for discharge by an "employer," as defined in the WPA, of an employee meeting the definition of "protected person" (a whistleblower). Mercy took the position that it is not an "employer" under the WPA, as it is controlled by a religious organization. This Court agreed with Mercy, which is why the Court granted judgment in Mercy's favor on Ms. Brown's

statutory claims. There is nothing in the WPA to support Mercy's position that it is relieved from common law liability by way of a statute that expressly exempts Mercy from its terms.

Furthermore, Mercy's suggested reading would not fulfill the legislative intent to "codify the existing common law" and provide a statutory "exclusive remedy" for plaintiffs such as Brown. Rather, Mercy's reading would amount to the abolishment of a common law cause of action and the elimination of any remedy whatsoever. This is directly contrary to the clearly stated legislative intent of the WPA.

A similar issue was presented in *Yount v. Keller Motors, Inc.*, 639 S.W.3d 458 (Mo. App. E.D. 2021). There, the employer argued that by defining the term "employer" to exclude employees of the employer, the legislature expressly and affirmatively eliminated the common-law protection of an employee who reports an unlawful act or misconduct of coworkers. The court rejected that argument:

> However, such a result would substantially limit rather than codify Missouri's existing common-law exceptions to the at-will employment doctrine. As is plainly understood by the language of the statute in Section 285.575.3, while the legislature may have had concern with a future expansion of whistleblower rights, the legislature was intent on retaining the common-law protections that existed upon the enactment of the WPA. Broadly applying the narrow definition of 'employer' set forth in 285.757.2(2) directly contradicts the express language of Section 285.575.3, which states this section is intended to codify the ***existing*** common-law exceptions to the at-will employment doctrine.

*Id.* at 467-68 (emphasis original).

The legislature is presumed to know the common law at the time it enacts a statute. *Id.* at 468, citing *Hopfer v. Neenah Foundry Co.*, 477 S.W.3d 116, 126 (Mo. App. E.D. 2015). At common law, Brown had the right to bring an action for wrongful termination for reporting violations of law or public policy to superiors, and for refusing to perform illegal acts. That right was not eliminated by the WPA.

*Brown's Whistleblower Claim and Claim She Refused to Follow Illegal Directives*

Brown claims that she reported illegal conduct of Mercy to her superiors. Specifically, Brown claims she reported illegality "when she told the physicians at the November 20, 2017 meeting that she felt what they were asking her to do with regard to first assisting was unsafe and outside the scope of her practice." She also claims she reported to Mercy's safety department, via a SAFE report, that she was asked to first assist in a c-section by her supervisor without proper training or expertise, rendering the surgery unsafe. According to Brown, she was asked to function outside of her "education, training, knowledge, judgment, skill, and competence as an RN," which she claims is illegal under Missouri law. Brown cites 20 Mo. C.S.R. 2200-4.100(4). Brown contends that her report of this conduct directly caused her termination.

Mercy contends that Brown did not report anything illegal, but was terminated for exhibiting a bad attitude and failing to get along with others. Mercy states that Brown's only report of unsafe conditions was a single complaint filed after she was terminated. That is not accurate. Mercy's Statement of Uncontroverted Facts ("SUF") states that Brown was suspended during a meeting on November 22, 2017. SUF ¶ 69. Brown's SAFE report was submitted to Mercy on the same day. Plaintiff's Exhibit 5 ("Reported date 11/22/2017"); Plaintiff's Statement of Additional Uncontroverted Facts ("SAUF") ¶ 63. Mercy admits that Brown was not terminated until November 29, 2017, which was seven days after Brown filed her SAFE report. SUF ¶ 71; SAUF ¶ 71.[2]

Brown contends she refused to act unsafely in connection with a November 17, 2017 c-section. Brown contends that proceeding with "faking it" during the procedure would have

[2] In her deposition, Brown confirmed that the SAFE report was dated November 22, 2017, but went on to testify that "I did submit that actually after Elizabeth told me that I would be terminated." The actual date of the SAFE report and date of Brown's termination are not in dispute – Brown made her safety report the date of her suspension but before termination.

violated the law. She contends that her refusal to obey the illegal directive led to her termination. Mercy contends that Brown was fired for her bad attitude, and that Brown was never asked to perform an unsafe or illegal activity.

The Court concludes that issues of fact remain in dispute as to Brown's common law claims.

*Conclusion*

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment is DENIED.

SO ORDERED:

Stanley J. Wallach
Circuit Judge, Division 12

Dated: 5/19/2022

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document has been filed with the Clerk of the Court through the Court's CM/ECF system on this 27th day of September, 2024, and that service of same was made via electronic delivery via the CM/ECF System to all participants.

/s/ *James M. Paul*
Attorney for Appellee Mercy Hospital St. Louis